Filed 11/14/23  P. v. Lee CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VINCTONIVISH DWANE LEE,<br><br>        Defendant and Appellant. | A164901<br><br><br>(Solano County<br>Super. Ct. No. VCR233736) |

This is an appeal from judgment after a jury convicted defendant Vinctonivish Lee of 17 felony counts related to his sexual abuse of his stepdaughter, A.M., from the time she was eight years old until she was 15. The trial court sentenced him to a total prison term of 144 years to life. Defendant raises multiple issues on appeal relating to, among other things, the sufficiency of evidence supporting one count of forcible lewd conduct and one count of forcible rape, the propriety of jury instructions related to juror unanimity, the admissibility of evidence and propriety of jury instructions on child sexual abuse accommodation syndrome, judicial misconduct and the constitutionality of his sentence.

For reasons discussed *post*, we reverse defendant's conviction on count 15, forcible rape, for insufficient evidence.  On remand, we direct the trial court to vacate the count 15 sentence and correct a clerical error in the abstract of judgment with respect to the count 2 sentence, which was imposed

1

to run concurrently and not, as stated, consecutively.  In all other regards, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2021, defendant was charged by an amended information with forcible lewd act on a child under age 14 (Pen. Code, § 288, subd. (b)(1); counts 1, 3, 14);[1] sexual intercourse or attempted sexual intercourse with a child aged 10 or younger (§ 287, subd. (a); count 2); forcible oral copulation of a child under age 14 and more than 10 years younger than the defendant (§§ 288.7, subd. (c)(2)(A), 269, subd. (a)(4); counts 4–5, 8–9); forcible rape (§ 261, subd. (a)(2); counts 6, 15); forcible rape of a child under age 14 (§§ 261, subd. (a)(2), 264, subd. (c)(2); count 7); forcible oral copulation of a child aged 14 or younger (§ 287, subd. (c)(2)(C); counts 10–11); attempted lewd conduct with a child under age 14 (§§ 288, subd. (a), 664; count 12); forcible rape of a child under age 14 and seven or more years younger than the defendant (§ 269, subd. (a)(1); count 13); forcible oral copulation (§ 287, subd. (c)(2)(A); count 16); and furnishing marijuana to a child aged 14 or older (Health & Saf. Code, § 11361, subd. (b); count 17).

Trial began on October 4, 2021.

## I. *The Prosecution's Case:  The victim was sexually abused by defendant from age 8 to age 15.*

### A.     The Hilltop Apartment:  Age 8 (2010–2011).

The victim's mother (mother) met and began dating defendant, who was about 10 years her junior, in 2011.  Shortly thereafter, defendant moved into the apartment in the Hilltop District of Richmond where mother lived with her two children, the victim and the victim's brother, M.M.  At the time, defendant was 20 years old (born in September 1991); the victim was eight

---

[1] Unless otherwise stated, all statutory citations are to the Penal Code.

2

years old (born on June 20, 2002); and M.M. was about three years younger than the victim. Both children had impaired hearing and wore hearing aids. Their mother worked as a preschool teacher. Defendant, unemployed, often stayed home to care for the children.

When the victim was eight years old, she and M.M. were home alone one day with defendant, who was giving them piggyback rides. During one of these rides, defendant pulled the victim into the bathroom and touched her "butt." He then took her into the bedroom, closed the door and placed the victim on his lap with her legs wrapped around his stomach. In this position, defendant touched her buttocks with his hands and rubbed her buttocks against his lap. Defendant asked the victim if she intended to tell her mother. She responded no because she was confused and thought he would not do it again. Further, the victim testified that she did not tell her mother because she was afraid.

Another time when the victim was eight, defendant entered the bedroom she shared with M.M. and placed his hand over her mouth. Her mother was away from the house, at choir practice. Defendant reached inside the victim's pajamas and touched her vagina. For about two minutes, defendant rubbed her vagina with two fingers, asking if it felt "good." The victim was "scared," "uncomfortable" and "disgusted." She did not believe that she could stop defendant because he was "bigger," "taller" and older. Defendant told the victim not to tell anyone and that her mother gave him permission to touch her. Defendant also warned that he would spank her if she told anyone. She kept quiet because she was afraid of defendant and his temper. In the household, defendant was sometimes responsible for discipline, which sometimes included spanking the children. The victim described feeling "trapped" and living a "nightmare."

3

A couple of days later, the victim was alone at home with defendant and M.M. Her mother was at bible study or choir practice. A few hours after the victim went to sleep, defendant entered her bedroom, woke her, put in her hearing aids (which she did not wear while sleeping), and told her to go to the living room. Once there, defendant turned on a children's movie and told her to be quiet. Defendant then laid the victim on the floor and removed both of their pants. The victim was afraid and told defendant not to remove her underwear, but he ignored her. He then rubbed lotion on his erect penis and tried to "force" it into her vagina. Defendant's penis partially entered the victim's vagina, causing her to cry and scream. Finally, after the victim told defendant three times to get off her, he became angry and told her to return to the bedroom.

The victim immediately went to the bathroom and noticed her vagina was bleeding. She found "a lot" of blood on her legs, clothes, and in the toilet, making her scream. She was afraid that she was dying. Defendant entered the bathroom and asked why she was screaming. He then instructed her to shower and took the bloody underwear, placed it in a bag, and threw it away. The victim cried while showering, her body in pain and her vagina "stinging" and "burning"—a 10 on the pain scale. Later, the victim cried herself to sleep. Again, she did not tell her mother, as she was afraid her mother would not believe her. However, she began to sleep with her hearing aids turned on so that she would hear defendant if he entered her bedroom.

A few days later, the victim was showering without her hearing aids when defendant entered the bathroom. She finally noticed him when he moved the shower curtain and began watching her. She asked what he was doing. Defendant then began touching her chest, rubbing her vagina, and touching her buttocks. The victim felt "disgusted." She believed that she was

4

powerless to stop him because "he told me he does it as long as he wants to do it." Days later, defendant threatened to spank the victim if she told anyone about the shower incident.

### B. Various Residences: Ages 11–12 (2013–2015).[2]

When the victim was 11 or 12 years old, she and her family briefly lived at her grandmother's house in El Sobrante.[3] One day, defendant took the victim into the bedroom, locked the door, pulled down his pants and instructed her to put his penis in her mouth. He then pushed the victim's head to his penis and inserted its tip into her mouth. However, before defendant could place it all the way in, her mother unexpectedly came home and banged on the door. Once mother was able to enter, she pulled the victim into the bathroom and asked whether defendant was "touching" her. Afraid that defendant would hurt her, the victim replied no.

After this first incident, defendant forced the victim to "suck" his penis about three days a week continuously until she was 15 years old. She recounted several specific incidents, including one when her family was staying at a homeless shelter, another at a motel and several times at defendant's sister's house.

When the victim was 11 or 12, the family moved again, to a house in Richmond. One time at this house, defendant took the victim into the living room, placed her on the couch and told her to take off her pants. Defendant put "oil" on his penis and told the victim to lie down. He then lay on top of her and inserted his penis into the victim's vagina. The victim was "shaking"

---

[2] When the victim was 11 years old, her mother and defendant had a baby girl. Their second daughter was born when the victim was 15 years old.

[3] The family moved a lot during this time period. The mother often worked long hours while defendant watched after the children.

from pain and tried to get away from defendant, but he held her down. Afterward, defendant told the victim to sit on the couch, where he placed his penis in her mouth. Defendant eventually ejaculated, causing the victim to vomit from disgust.

On another occasion at this house, defendant removed the victim's shirt and pants and licked her breasts for about 10 minutes. The victim felt powerless to stop defendant because she was afraid of him and his temper.

On a different day, defendant followed the victim into the kitchen and told her to kneel down and to orally copulate him. Defendant grabbed the victim's neck and forced her mouth to his penis, at which point M.M., who was in elementary school, entered the room. M.M. saw defendant "trying to make [his] sister suck his penis." The next day, defendant warned M.M. that if he told anyone about what he saw, he would "be hurt." M.M. did not tell anyone because he was afraid and wanted the family to be happy. M.M. recalled being frequently told to go to another room and close the door while defendant and the victim were alone in a room together.

### C.    Lighthouse Drive:  Ages 14–15 (2015–2017).

When the victim was about 14 years old, the family moved to an apartment on Lighthouse Drive in Vallejo. On one occasion while living there, defendant took the victim into a walk-in closet, forced her to lie down, and inserted his penis in her vagina. The victim, shaking with fear, complied with defendant's command to stay still. Afterward, defendant forced the victim to orally copulate him while he orally copulated her. Defendant again ejaculated into her mouth, causing her to vomit in disgust.

On a different date, the victim got in trouble for smoking marijuana with some friends. Defendant was angry about this incident and about the victim's talking to boys on social media, so he confronted her after school. He

6

gave her marijuana and instructed her to smoke it, accusing her of thinking she was a "big girl." The victim inhaled three "puffs" before telling defendant she did not want to smoke any more. However, defendant insisted that she continue and then took her into the bedroom and instructed her to remove her pants and underwear. After the victim reluctantly complied, defendant inserted his penis into her vagina. She screamed loudly because it hurt, and she wanted him to stop. Defendant eventually did stop because she "kept moving," but then he made her orally copulate him. The victim complied because she felt powerless and feared he would physically punish her if she refused. However, at some point the act made her vomit, enraging defendant, who cursed at her. Afterward, the victim cried, shook, and continued to feel vaginal pain.

After this incident, defendant once forced the victim to watch pornography in which a female actor orally copulated a male actor before the actors had sexual intercourse "doggie style." Defendant told the victim that he wanted her to perform the acts on him.

The victim subsequently told defendant that she wanted to tell her mother what was happening because she wanted the abuse to stop. Defendant became angry and "looked scary," telling the victim that he did not care what she wanted and that she had no choice in the matter. In the end, the victim did not tell her mother because she felt alone and powerless and wanted to "keep the family going . . . ." At the time, the victim believed her mother was happy with defendant. She later discovered, however, that her mother was unhappy and wanted to separate from him.

**D. Disclosure of Defendant's Abuse.**

    1. <u>The Victim's Diaries.</u>

Throughout defendant's abuse, the victim wrote in one of her two diaries. She found writing in her diaries cathartic and did not expect anyone to read them. Her mother recalled the victim's writing in her diaries periodically since 2013 or 2014. One diary entry read: "When I was little, [defendant] started touching me.·The first time that—the first time when my mom was at work and we was playing and he told me to go in the room and he told me to start—he started touching me, and he said, don't tell my mom— tell your mom or I'm going to hurt you.·And since then I was scared.·He would make me do stuff I didn't want to do.·He would make me."

Another diary entry read: "Watch porn videos, touch him, put his thing in my mouth, try to put his stuff in my private area and I would cry and scream and he didn't care.·I started bleeding.·I was so scared.·I had to deal with this since seven to fifteen. . . . [¶] . . . [¶] . . . I didn't tell somebody that I needed help.·I feel dirty."

In July 2017, mother and defendant separated after a prolonged period of conflict. The victim decided that she wanted her mother to know about defendant's abuse but did not know how to tell her. The victim was worried about her little sisters' safety. She decided to leave her diary visible in her room in the hope that her mother would find and read it.

This plan eventually worked. One day in December 2018, defendant was at the family home, visiting his two biological daughters. At some point, the victim and M.M. returned from a visit with their biological father and the victim went to the bathroom. While she was in the bathroom, her mother found the diary and read about defendant's abuse. Upset and in "total shock," mother asked the victim to accompany her to the store. When they

8

reached the store, mother confronted the victim about what she had read, asking whether it was true and when did it start. The victim replied that it started when she was a "little girl" and then "told [her mother] everything."

On January 4, 2019, mother reported defendant's crimes to the police, who then interviewed the victim on January 23, 2019. The victim described multiple incidents of his abuse at multiple locations. A few days later, she underwent a forensic sexual assault exam performed by a forensic nurse. The victim told the nurse that defendant repeatedly penetrated her vagina with his penis, digitally penetrated her and forced her to orally copulate him between the ages of eight and 15. The nurse found that the victim's hymen had healed from a prior trauma, indicating sexual abuse, and that her genital exam results were abnormal. The nurse opined based on these findings that "sexual abuse is highly suspected."

## 2. CSAAS.

Dr. Anthony Urquiza, a clinical psychologist, professor, and director of a child abuse treatment program, testified that it is common for victims of sexual abuse to delay reporting it. Dr. Urquiza described child sexual abuse accommodation syndrome, or CSAAS, which recognizes five common patterns: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation. Briefly explained, CSAAS does not diagnose abuse but assumes the victim has been abused. The patterns observed by CSAAS are a consequence of the fact that the sexual abuser of a child is often an older person with whom the child has an ongoing relationship. The abuser often manipulates the child by, among other things, threatening him or her emotionally or physically in order to maintain secrecy. The child victim may, in turn, feel afraid and helpless and, thus, delay

9

reporting the sexual abuse, give vague or incomplete descriptions, report the abuse over time in a piecemeal fashion, or recant his or her disclosures.

## II.   *Defense Case.*

The defense called a forensic nurse to testify that the victim's sexual assault exam indicated a "normal" hymen and that the opinions of the prosecution's nurse were unreliable.  Based on her review, the defense expert could neither confirm nor negate sexual abuse in this case.

Dr. William O'Donohue, a clinical psychologist and professor, criticized CSAAS, noting that no study had been undertaken to examine the extent to which its five characteristics were present in child sex abuse cases. Dr. O'Donohue agreed, however, that secrecy, delayed disclosure, and problems with recollection were common features in child abuse cases.

Defendant's sister testified that she never saw defendant behave inappropriately with the victim or any other child.

## III.   *The Verdicts, Sentence and Appeal.*

On October 21, 2021, the jury found defendant guilty as charged.  On March 18, 2022, defendant was sentenced to state prison for 144 years to life. In reaching this total term, the trial court imposed consecutive terms of 15 years to life on counts 4, 5, 8, 9 and 13, and a concurrent term of 25 years to life on count 2.  These terms were set to run consecutively to an aggregate determinate term of 69 years 4 months, consisting of middle term sentences for counts 1, 3, 6–7, 10–11 and 14–16, and one-third the middle term sentences for counts 12 and 17.  Defendant filed a timely notice of appeal on March 25, 2022.

## DISCUSSION

Defendant contends the judgment must be reversed because: (1) insufficient evidence supported counts 3 and 15; (2) the instruction on

juror unanimity was prejudicially erroneous; (3) expert testimony on CSAAS is inadmissible as a matter of law because it fails to meet the criteria for scientific evidence or, alternatively, the instruction on CSAAS was prejudicially erroneous; (4) the trial court committed prejudicial misconduct by interrupting defense counsel's closing argument and instructing the jury to consider only evidence admitted to the record; (5) the trial court engaged in judicial fact finding in violation of the Sixth Amendment in imposing full consecutive terms on certain counts; (6) his sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment; and (7) the cumulative impact of multiple errors deprived him of due process. In addition, both parties agree the abstract of judgment must be modified to correct a clerical error regarding his count 2 sentence. We address each issue *post*.

## I. *Substantial evidence supports the conviction on count 3 but not count 15.*

### A. Count 3, forcible lewd conduct, stands.

Defendant contends the verdict on count 3, forcible lewd act on a child under age 14, must be reduced to the lesser included offense under section 288, subdivision (a) because there is no evidence he committed the offense through use of "force, violence, duress, menace, or fear of immediate . . . bodily injury" (§ 288, subd. (b)(1)). On this basis, he asks for resentencing.

The applicable standard of review is well established. " 'In considering a challenge to the sufficiency of the evidence to support [a particular count], we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have

11

reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." ' [Citation.]" (*People v. Renteria* (2022) 13 Cal.5th 951, 970.)

Defendant was charged in count 3 with violating section 288, subdivision (b)(1) by forcibly touching the victim's breasts and vagina in the shower between June 20, 2011, and June 19, 2012. This provision requires evidence that the defendant (1) committed a lewd or lascivious act on a child under age 14 with the intent to arouse or satisfy his or the child's sexual desires (§ 288, subd. (a)) and (2) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim (§ 288, subd. (b)(1)). (*People v. Soto* (2011) 51 Cal.4th 229, 237, 242 [noting that a conviction under § 288, subd. (b)(1) is for an aggravated lewd act as compared to § 288, subd. (a)].) The record, described *post*, supports this charge.

The victim testified that when she was eight or nine years old and living in the Hilltop District of Richmond, defendant entered the bathroom while she was showering. Initially, he sat on the toilet and watched her. He then used both hands to touch her breasts, bottom, and vagina. The victim was afraid and felt "disgusted," but she acquiesced because she felt she had no choice.

Defendant argues the "force" requirement of section 288, subdivision (b)(1) was not met because there was no evidence that he used force, fear, duress, or menace toward the victim when he touched her in the shower. We disagree.

12

As defendant correctly notes, the force required to prove an aggravated lewd act under section 288, subdivision (b) is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*People v. Soto, supra*, 51 Cal.4th at p. 242.)  Relevant here, such force in the form of "menace" refers to " 'a threat, statement, or act showing an intent to injure someone.' "  (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1073; CALCRIM No. 1111.)  " '[D]uress,' " in turn, "means ' "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce *a reasonable person of ordinary susceptibilities* to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." ' "  (*People v. Soto, supra*, 51 Cal.4th at p. 246; CALCRIM No. 1111.)

" ' "The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress [or menace]." [Citation.]' [Citations.]  'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.' "  (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.)  In considering these factors, "[t]he fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress.  [Citation.]  When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."  (*People v. Thomas, supra*, 15 Cal.App.5th at pp. 1072– 1073.)

Here, the evidence sufficed to prove defendant accomplished the lewd act charged in count 3 by means of duress or menace.  The victim was just eight or nine years old, and her mother was away from home.  Defendant was

her stepfather, he had a temper, and she was told by her mother to obey him. Just days before the incident, defendant threatened to spank the victim if she told anyone he molested her. He also told the victim that her mother approved of his behavior, which made the victim feel as if she had no choice and that "he does it as long as he wants to do it." Even assuming defendant did not use substantial physical force against the victim, she nonetheless felt scared, confused, and helpless. Similar to *People v. Thomas, supra*, "[t]he evidence demonstrates a vulnerable, isolated child who was compelled to participate in sex acts in response to parental authority and violent intimidation and not the result of freely given consent. Because of [the victim's] young age at the time of the abuse and defendant's position of authority, she was particularly susceptible to being coerced." (15 Cal.App.5th at p. 1073.)

Defendant counters that the victim testified that she was *not* thinking of his prior threat to spank her if she told anyone about his abuse during the shower incident. This testimony does not undermine a finding of duress or menace. "A perpetrator may *use* duress, menace, or threats against a victim even if this conduct does not ultimately influence the victim's state of mind. In the context of lewd acts with a child under 14, it is the defendant's menacing behavior that aggravates the crime and brings it under section 288(b)." (*People v. Soto, supra*, 51 Cal.4th at p. 243.) "Because duress is measured by a purely objective standard, a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." (*Id*. at p. 246.)

Thus, on this record, a jury could have reasonably found beyond a reasonable doubt that defendant committed the lewd act charged in count 3 by means of (1) "[d]uress," meaning "a direct or implied threat of force,

14

violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to," or (2) "[m]enace," meaning "a threat, statement, or act showing an intent to injure someone" (CALCRIM No. 1111). (Italics omitted.) Defendant's conviction on this count therefore stands.

## B. Substantial evidence does not support count 15.

Defendant contends there was insufficient evidence to prove he committed three counts of forcible rape against A.M. once she turned age 14. According to defendant, the victim testified that he forcibly raped her just twice—the incidents identified in counts 6 and 7. She did not testify as to the third incident identified in count 15, requiring reversal. For reasons set forth *post*, we agree the record is not consistent with three incidents of forcible rape during the time frames charged in these counts.

Defendant was charged in count 15 with violating section 261, subdivision (a)(2) by forcibly raping the victim between May 1, 2016, and December 31, 2017.[4] In contrast, counts 6 and 7 also charged forcible rape in violation of section 261, subdivision (a)(2), the former occurring between June 20, 2015, and June 19, 2017, and the latter occurring between June 20, 2017, and December 31, 2017.

Relevant to these charges, the victim testified that after the family moved to a house in the Lighthouse neighborhood of Vallejo when the victim was 14 or 15 years old, defendant forcibly raped her in a walk-in closet while her mother was at work. After this testimony, the prosecutor asked whether "the only time the defendant forced you have to sex with him [was] in the walk-in closet?" The victim responded, "Yes." The prosecutor then asked, "Did he ever ask—did he ever put his penis in your vagina again at [the

---

[4] The victim turned 14 years old on June 20, 2016.

15

Lighthouse] residence?" The victim confirmed, "Not that I recall, no," but then agreed at the prosecutor's prompting to look at a transcript to refresh her recollection.

After refreshing her recollection with the transcript, the victim testified to another incident of forcible rape that occurred after school in her bedroom. On this occasion, defendant forced the victim to have intercourse after first making her smoke marijuana as a punishment for getting caught "smoking weed and talking to other boys." Defendant also made the victim orally copulate him on this occasion. She was 14 years old at the time. Around her 15th birthday, defendant and her mother separated, and he moved out of the Lighthouse residence.

At this point the prosecutor asked the victim whether, "after the incident that you testified about earlier today—or, earlier before the break involving the defendant smoking marijuana with you and then forcing you to have sex, after that, but prior to the defendant leaving this Lighthouse residence, did he ever again force you to have sex with him?" The victim responded in the negative, explaining, "Not have sex, just the sucking his penis."

Despite this testimony, the People insist there was a third incident of rape at the family's Lighthouse residence. According to the respondent's brief, one of these forcible rape counts involved the victim's forcible rape in her bedroom after defendant made her smoke marijuana while another of these counts involved her forcible rape in the walk-in closet. The third incident of forcible rape took place in a car parked near a park while the family was living at the Lighthouse residence.[5]

---

[5] In closing arguments, the prosecutor appears to conflate the forcible rape incidents charged in counts 6 and 7, referring to both as having occurred

There are multiple problems with this argument.  First, the victim testified that the car incident occurred before the family moved to the Lighthouse residence, in between her middle school and high school years. As such, the car incident does not come within the time frames identified in counts 6, 7 and 15.  More importantly, the defense moved for a mistrial following the victim's testimony regarding intercourse (as well as oral copulation) in the car because the evidence had not been disclosed prior to trial.  The prosecution opposed the mistrial but agreed the evidence was not previously disclosed and thus did not form the basis of any of the charges. Yet, the prosecutor claimed there was no prejudice to the defense because "while she initially said it involved penis to vaginal penetration, she subsequently said it was oral copulation.·So while this is an additional specific instance that the defense was not aware of, I don't know think it prejudices them let alone to cause a mistrial." (*Sic.*)  The court denied the mistrial after noting that sexual abuse victims often have "memory issues" that can be addressed in cross-examination.  However, the court acknowledged the incident "can't be the factual basis for any particular charge."  On cross-examination, the victim acknowledged having no memory of being forced to orally copulate defendant in the car until it "popp[ed] up in my head" while testifying the previous day.

Under these circumstances, we agree with defendant that the evidence established only two incidents of forcible rape occurring when the victim was around 14 or 15 years old and living at the Lighthouse residence.

---

in the walk-in closet at the Lighthouse residence.  The prosecutor then described count 15 as the act of forcible rape that occurred after defendant had the victim smoke marijuana.

17

Accordingly, his conviction on count 15 cannot stand and his sentence must be vacated.

## II. *The juror unanimity instruction was proper.*

Defendant contends the trial court erred by giving CALCRIM No. 3501, the standard instruction on juror unanimity, because the language was argumentative and lessened the prosecution's burden of proof. This instruction, given to the jury for purposes of counts 4–11, 13, and 15–16, read as follows:

"The People have presented evidence of more than one act during specific periods of time to prove that the defendant committed these offenses, or the lesser-included offenses to those counts.

"You must not find the defendant guilty unless[:]

"1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; OR

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

According to defendant, CALCRIM No. 3501 "undermined [his] presumption of innocence by argumentatively telling the jurors [in part 1] the People have successfully presented evidence of the alleged conduct permitting an inference [that he] committed at least some of the charged offenses." (See *People v. Wright* (1988) 45 Cal.3d 1126, 1135 [an argumentative instruction "invite[s] the jury to draw inferences favorable to [one party] from specified items of evidence on a disputed question of fact"].) We disagree.

18

In a criminal case, a jury verdict must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*Ibid.*, italics omitted.) "In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*People v. Jones* (1990) 51 Cal.3d 294, 321–322 (*Jones*).)

On appeal, we apply a de novo standard, asking whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Frye* (1998) 18 Cal.4th 894, 957; *People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) In doing so, we are mindful that " ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citations.]" (*People v. Frye*, at p. 957.)

As the People note, CALCRIM No. 3501 reflects the unanimity instruction approved by the California Supreme Court in *Jones*. (Accord, *People v. Fernandez* (2013) 216 Cal.App.4th 540, 556 (*Fernandez*) [noting the unanimity rule has been "refined" in cases involving young children

experiencing "repeated identical" acts of sexual abuse, which makes it difficult for the children to articulate exact details of the abuse for the jury].) "CALCRIM No. 3501 is an alternative instruction to CALCRIM No. 3500. CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged].' " (*Fernandez, supra*, at p. 556.)

In this case, both the prosecutor and defense counsel agreed to the court's giving CALCRIM No. 3501. This was appropriate, as there was "no reasonable likelihood of juror disagreement as to particular acts, and the only question [was] whether or not the defendant in fact committed all of them . . . ." (*Jones, supra*, 51 Cal.3d at pp. 321–322.) Defendant does not dispute this. Nor could he, as the victim testified about multiple specific and general instances of abuse. (*Ante*, pp. 3–7.) Instead, he now argues the instruction's introductory language, approved in both *Jones* and *Fernandez*, improperly "favor[ed] the prosecution by telling the jurors there [was] evidence of multiple violations of the law [which] resulted in a miscarriage of justice." Not so.

Paragraph 2 of CALCRIM No. 3501, as given, merely states that the prosecution "presented evidence of more than one act during specific periods of time to prove that the defendant committed these offenses . . . ." Acknowledging that such evidence has been presented for the purpose of proving defendant committed a charged offense does not, in and of itself,

20

favor the prosecution, much less reduce its burden of proof or diminish the presumption of innocence. (See *People v. Russo, supra*, 25 Cal.4th at p. 1132 [unanimity instruction appropriate where "the evidence suggests more than one discrete crime"].) Indeed, had there been no evidence presented on a particular count, the trial court likely would have dismissed it or directed a defense verdict before it reached the jury.

Moreover, paragraph 3 of CALCRIM No. 3501, as given, makes undeniably clear defendant cannot be found guilty unless jurors unanimously agree the prosecution met its burden to prove either that "defendant committed at least one of these acts and you all agree on which act he committed for each offense" or "defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged." And the jury was, of course, also given the common core of instructions designed to safeguard the constitutional rights of defendants in criminal trials, including instructions on the presumption of innocence and the prosecution's burden to prove guilt beyond a reasonable doubt. There is no indication the jury here shunned its duty to follow these well-known commands. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1028 [reviewing court must assume jurors are " 'intelligent persons and capable of understanding and correlating all jury instructions which are given' "].)

Thus, having considered the language of CALCRIM No. 3051 in its entirety and in conjunction with the rest of the jury charge, we conclude there is no "reasonable likelihood that the jury understood the instruction in a manner that violated defendant's rights." (*People v. Andrade, supra*, 85 Cal.App.4th at p. 585.) Accordingly, defendant's instructional claim fails.

III. ***The trial court properly admitted CSAAS testimony and instructed the jury on its permissible use.***

A. **Admission of Expert Testimony.**

Defendant contends the trial court prejudicially erred by admitting expert testimony from Dr. Urquiza, a clinical psychologist (among other things), on CSAAS. As defendant acknowledges, a trial court has broad discretion to decide whether to admit expert testimony, and we review its decision on appeal for abuse of discretion. (*People v. Duong* (2020) 10 Cal.5th 36, 60.) According to defendant, the trial court abused its discretion by admitting the CSAAS testimony without first finding that it was scientifically reliable, citing *People v. Kelly* (1976) 17 Cal.3d 24, 30; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013; and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469]. This argument fails.

As an initial matter, we reject defendant's suggestion that CSAAS testimony in general runs afoul of the rules of admissibility set forth in *Kelly*, *Frye* and *Daubert*. As case law explains, the "*Kelly* rule applies only to expert testimony 'based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [citations].) The *Kelly* rule applies only if 'the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data.' (*Ibid*.)" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*).) CSAAS testimony falls outside the scope of this rule, as it is far from new and "does not purport to provide a definitive truth." (*Lapenias, supra*, 67 Cal.App.5th at p. 173; see *People v. Munch* (2021) 52 Cal.App.5th 464, 472 (*Munch*) [CSAAS testimony is not "new experimental scientific

evidence ' "not previously accepted in court" ' " (italics omitted)].) Rather, CSAAS testimony is " 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' [Citation.] . . . Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' (*People v. Stoll* (1989) 49 Cal.3d 1136, 1161 [citations]; see also *People v. McAlpin* [(1991)] 53 Cal.3d [1289,] 1300–1301; [citations]." (*Munch, supra*, 52 Cal.App.5th at p. 473.)

Further, a long line of California courts, extending over three decades, have deemed CSAAS expert testimony admissible for the limited purpose of explaining how and why child victims may react in unexpected and perhaps counterintuitive ways to having been sexually abused. (E.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 394–395; *People v. Sedano* (2023) 88 Cal.App.5th 474, 479; *Lapenias, supra*, 67 Cal.App.5th at p. 171; *Munch, supra*, 52 Cal.App.5th at p. 468.) As the California Supreme Court explained, CSAAS evidence is "not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301, fn. omitted.)

Thus, a CSAAS expert may not " 'vouch[] for the veracity' " of the alleged victim (*Lapenias, supra*, 67 Cal.App.5th at p. 180), opine on whether

the victim is telling the truth (*Munch, supra*, 52 Cal.App.5th at p. 468), or give " ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885–886.)  The expert may, on the other hand, explain CSAAS "to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at p. 1300.)

Here, there is no question the prosecution's CSAAS expert stayed within these permissible legal bounds.  Dr. Urquiza testified regarding the five common patterns exhibited by child abuse victims (*ante*, p. 9) and explained that not all victims exhibit any or all of them.  Dr. Urquiza also explained that CSAAS is meant to be an educational tool designed to correct misconceptions about child sexual abuse victims.  It is neither a medical diagnosis nor a disorder but a pattern observed by therapists working with victims who have disclosed abuse.  Dr. Urquiza also made clear he never spoke to the victim, knew nothing about this case, and had no opinion on whether defendant was guilty or innocent.

In addition, the trial court briefly paused the expert's testimony to explain to the jury:  "[CSAAS testimony] is not evidence that the defendant committed any crime. · This is not evidence that's designed to affirmatively prove to you any particular act or to say that you listened to [the victim] and say because this factor is present therefore that means that [defendant] is guilty. · That's not what this evidence is designed to do. · It's just the opposite. · This evidence is designed exclusively to rebut misconceptions that people may have. · For example, as the Doctor has been testifying, you may think

that common sense says that if someone were being abused they would report it right now, or you may think that common sense would suggest a delay means something. · Maybe it means something.  Maybe it doesn't. · But the purpose of all the Doctor's testimony here is to not have you make assumptions about how a child might behave because there's any possible number of interpretations of the evidence."[6]  Defense counsel then had ample opportunity to test the strength of Dr. Urquiza's opinions, both on cross-examination and through the testimony of its own expert, Dr. O'Donohue, who testified at length on the weaknesses of the CSAAS research.  Under these circumstances, we conclude the trial court acted within the scope of its discretion in admitting the CSAAS evidence.

Finally, we reject defendant's invitation to join a minority of jurisdictions, such as Kentucky and Louisiana, that have held CSAAS evidence is inadmissible as a matter of law.  We are bound by and supportive of California Supreme Court precedent that has long accepted CSAAS as relevant and helpful to a jury called upon to consider a child witness's credibility when, as here, the defendant suggests the child's subsequent conduct is inconsistent with his or her allegations of sexual abuse.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301 [noting, " 'The great majority of courts approve [CSAAS] expert rebuttal testimony' "].)  The court's ruling thus stands.

---

[6] The trial court also gave the jury CALCRIM No. 1193, the standard instruction on CSAAS, at the close of evidence.  The propriety of this instruction is discussed *post* (pp. 26–29).

## B. CALCRIM No. 1193.

Defendant next contends the trial court prejudicially erred by giving the jury CALCRIM No. 1193, the standard instruction on CSAAS. We review this challenge de novo, considering whether there is a reasonable likelihood the jury misapplied the instruction in a manner that undermined the defendant's constitutional rights. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.) We also consider the instruction in the context of the jury charge as a whole, rather than in isolation. (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.) We begin with the relevant record.

As explained *ante* (pp. 9–10), while Dr. Urquiza was on the stand, the trial court interrupted his testimony to explain the proper use of CSAAS. The court instructed, among other things, that "[CSAAS] testimony is not evidence that the defendant committed any crime" and "is designed exclusively to rebut misconceptions that people may have." For example, the court explained, a victim may delay reporting the abuse. "Maybe it means something. Maybe it doesn't. · But the purpose of all the Doctor's testimony here is to not have you make assumptions about how a child might behave because there's any possible number of interpretations of the evidence."

Then, at the close of evidence, prior to deliberations, the court again instructed the jury on CSAAS per CALCRIM No. 1193: "You heard testimony in this case from Drs. Urquiza and O'Donohue regarding [CSAAS]. · Now, this testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him or any conduct or charges with which he was not charged. · You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."

26

Defendant contends this version of CALCRIM No. 1193 improperly allowed jurors to use CSAAS evidence to decide whether the victim was credible, which undermined his presumption of innocence and the People's burden to prove his guilt beyond a reasonable doubt. This argument fails on several grounds.

First, CALCRIM No. 1193, as given, was legally correct and responsive to the evidence presented at trial. (*Munch, supra*, 52 Cal.App.5th at p. 474; *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176 ["[CALCRIM No. 1193] accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence"]; *People v. Gonzalez* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzalez*).) Dr. Urquiza (and Dr. O'Donohue) testified that CSAAS was not a diagnostic tool to determine defendant's guilt or the veracity of the victim's allegations. Dr. Urquiza also confirmed he had no familiarity with the facts of this case or opinion as to its outcome. Viewed in this context, "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the CSAAS] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the experts'] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzalez, supra*, at p. 504; accord, *Munch, supra*, at p. 474.)

Moreover, in the context of the entire jury charge, there is no reasonable likelihood the jury misapplied CALCRIM No. 1193 in the manner

27

defendant contends. Specifically, he argues that in following this instruction, the jury likely relied on the CSAAS testimony to impermissibly bolster the victim's credibility and determine the truth of the charges. Yet, nothing in CALCRIM No. 1193 allowed this to occur, and multiple instructions prohibited it. For example, the court twice instructed the jury that the experts' CSAAS testimony was not evidence that defendant committed any charged act and was intended only to rebut certain misconceptions about abuse victims, such as that a victim's delay in reporting abuse should be deemed inconsistent with having been abused. The court also instructed that the very purpose of Dr. Urquiza's testimony "is to *not* have you make assumptions about how a child might behave because there's any possible number of interpretations of the evidence." (Italics added.)

The same is true for defendant's argument that the court's giving of CALCRIM No. 1193 somehow lowered the People's burden of proof and undermined his presumption of innocence. On the contrary, the court clearly instructed the jury on defendant's presumption of innocence, the prosecution's burden to prove each element of each crime beyond a reasonable doubt, and jurors' obligation to review all evidence before concluding "the testimony of one witness proves a fact . . . ." Nothing in the record suggests that the jury disregarded these commands. Under these circumstances, we find no reasonable likelihood the jury applied CALCRIM No. 1193 in a manner that deprived defendant of his constitutional rights to due process and a fair trial. (*People v. Lemcke, supra*, 11 Cal.5th at p. 655 [one instruction must not be judged in artificial isolation but considered in the context of the whole charge].)

And, finally, even assuming for the sake of argument that CALCRIM No. 1193 should not have been given, defendant invited any error by

28

requesting this instruction, as it was read without any clarification or modification.[7] Given his acquiescence at trial, defendant may not claim on appeal that the instruction as read was improper, inadequate, or incomplete. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901 ["Because defendant did not object at trial that the instructions were incomplete as given, the issue is forfeited"]; *People v. Lee* (2011) 51 Cal.4th 620, 638 ["If defendant believed the instruction on consent required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court"].)

## IV. *There was no judicial misconduct.*

Defendant next contends the trial court engaged in prejudicial misconduct by exhibiting bias in the prosecution's favor. This alleged misconduct occurred when the trial court interrupted defense counsel's closing argument sua sponte and, after excusing the jury, reprimanded counsel for insinuating that the victim's entire diary was in evidence when, in fact, only four pages were admitted. When the jury returned, the court instructed it to consider only evidence admitted at trial. According to defendant, when the prosecutor similarly referenced the victim's diary during his argument, the judge made no comment, indicating to the jury that the prosecutor's case was favored. For reasons that follow, we find no misconduct, much less prejudice.

" 'Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason . . . a judge should be careful not to throw the weight of [the judge's] judicial position into a case, either for or against the defendant.' " (*People v. Nieves* (2021) 11 Cal.5th 404, 484–485.) At the same time, " 'isolated comments in a

---

[7] Defendant moved to exclude the CSAAS testimony but then requested that CALCRIM No. 1193 be given should his motion be denied (which it was).

lengthy trial in which the court exhibited some impatience with counsel's argumentative comments and questions do not demonstrate misconduct or bias.' " (*Id.* at pp. 482–483; cf. *People v. Woodruff* (2018) 5 Cal.5th 697, 768 [trial court " ' "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" ' "].)

"We 'evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.' [Citation.] 'The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made. [Citation.]' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 531–532.)

In this case, defendant does not dispute that a trial court has discretion to rebuke an attorney for inappropriately suggesting that the jury consider evidence not admitted at trial. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 320.) Based on our review of the record, we conclude that is what happened here. After an extensive hearing at which the victim was questioned at length about her diaries, the court admitted just four pages. Nonetheless, during closing arguments, defense counsel told the jury: "When you look, and I invite you to look at [the victim's] journal, it's not dated. Those pages have no date. It's all written in past tense and very correct grammatical form with commas, like a narrative." Defense counsel continued: "[The victim's mother] indicated she wrote in that journal in the month period before when she says she found it and when she turned it to the police.· She indicated no less important that she had looked in that journal before and when she looked in this journal before, that writing that you have in evidence was not there.· The writing was not there.· She was also asked on

30

direct by [the prosecutor] if she ever saw her daughter write in the journal. · She said yes, I would see her write in the journal. · [The prosecutor] asked her what did she use to write in the journal, was it green markers? · No. · She used pens and pencils. · The observations by [the mother] as to that journal do not correlate with the theory that it's dated and verifiable and the smoke gun, as we should say. · You could look at the journal for yourself." (*Sic.*)

At this point, the trial court interrupted defense counsel and the following colloquy took place:

"[The court]: · I have a real problem with this argument.  Three times you have told them specifically they can look at the diary. · The diary I did not accept into evidence. · The diary is on your objection to it.

"[Defense counsel]:  Well the— [¶] . . . [¶] . . . I'm reference [*sic*] the two pages.

"[The court]: · No, you're not.

"[Defense counsel]: · That [the prosecutor] read it to them.

"[The Court]: · Stop. · What you're doing here is a problem, because you're not even doing close to what you just said you're doing. [¶] Anyway, so I don't know. · What does [the prosecutor]—

"[Defense counsel]: · I'll point out for the record there's not even an objection. · At this point the Court is interjecting itself . . . ."

Defense counsel then complained the trial court's interjection was part of an ongoing pattern of "[c]riticizing, minimizing, and refuting what the defense counsel is doing in front of a client, inappropriately, extensively, and consistently"—an argument defendant does not make on appeal.  The trial court, in turn, noted that the jury was excused before it raised the diary issue with counsel "specifically so we didn't have this discussion here. · But, I've got this concern about this issue."  The prosecutor agreed with the court, noting

31

defense counsel had insinuated to the jury that none of the diary entries were dated when, in fact, many were.  The prosecutor also noted that it had sought admission of both diaries in their entirety but defense counsel had successfully objected.

Ultimately, the trial court ruled:  "I have to tell them the diaries are not in evidence. · The diaries are not in evidence. · They can't speculate about things that are not in evidence, either way.  So, if either lawyer says something about what is in the diary or what isn't in the diary, other than the four pages that were received, they need to disregard that because it's not supported by the evidence. · It seems to me, at a minimum, that's what we do. · Then keep moving, right."

Accordingly, the trial court gave the following instruction over defense counsel's objection that the court was "interject[ing] itself at a pivotal moment" in his argument:  "I wanted to make sure we were all on the same page. · These diaries that you have heard reference to, we allowed four pages of that diary to be admitted. · They've been received as evidence as an exhibit and you can review that. · The remainder the diaries or diaries is not in evidence.

"Like all things, there may be other situations when you start deliberating you ask me if you can see there or that or various things, the answer is always going to be the same.  If it was not received in evidence, during this trial, we can't add additional things to the record. · You can't review additional things that are not received as evidence. [¶] . . . [¶]

"Don't speculate about why things are not in evidence.  Don't speculate about what is in that evidence, if you don't receive it. · Again, evaluate this case based on the evidence that is presented to you. · And also don't speculate at all basically what happens, I know I've indicate there had several times

what happens if I ask you to step outside for a minute, don't—it's not relevant to your task. · So please, don't speculate about it.

"And I've said this before, I will say this again in my closing arguments, don't speculate at all about what I think about anything. · You know, I've given you the law, you're required to follow the law, as I gave you the instructions.  But other than that, my views about anything are not pertinent or relevant and you shouldn't speculate or even care about what I think about the facts in this case."[8]  (*Sic.*)  Afterward, defense counsel resumed his argument, clarifying to the jury that his comments about the diary related to the admitted entries only.

On this record, we conclude the trial court acted within the scope of its discretion by (1) interrupting defense counsel's argument and, after excusing the jury, admonishing him for mischaracterizing the evidence, and (2) instructing the jury upon its return not to consider or speculate about any portion of the diaries not admitted into evidence.  " 'While counsel is accorded "great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation]," counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation].' "  (*People v. Collins* (2010) 49 Cal.4th 175, 209.)

In so concluding, we reject defendant's claim that the trial court's failure to similarly interject during the prosecutor's closing argument demonstrated judicial bias.  Specifically, after the trial court gave the above described instructions, the prosecutor argued:  "I'm not going to read the diary again to you.  It's in evidence."  According to defendant, this argument

---

[8] Similarly, the court instructed the jury prior to deliberations that "it is [*sic*] not been my role to tell you what your verdict should be.  Don't take anything I said during this trial as an indication of what I think about the facts, the witnesses or what your verdict should be."

was just as improper as his counsel's argument, and the trial court's failure to admonish the prosecutor "sent a message that the People's interpretation of the diary was more legitimate than the defense's." This argument, however, disregards the very instructions given to the jury, which made clear the entire diary was not in evidence and the jury should not speculate about its content. Nor were the court's views relevant or a proper subject of consideration. We presume the jury understood and followed these straightforward commands—there was no reason for the court to repeat them. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

Finally, even assuming for the sake of argument the court was wrong to interrupt defense counsel's argument but not the prosecution's, we would nonetheless find no prejudice. First, as we just explained, the curative instructions given by the trial court during defense counsel's argument were comprehensive and correct. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 161 [a verdict must be based solely on the evidence admitted at trial].) Second, the more heated exchange between the court and defense counsel—wherein the court expressed exasperation about defense counsel's diary argument and counsel expressed anger about the court's sua sponte interjection—occurred outside the jury's presence. As such, there is no basis for concluding the exchange prejudiced the jury's view of the defense. (*People v. Nieves, supra*, 11 Cal.5th at p. 496 [where the trial judge's improper and "excessively punitive" comments took place outside the jury's presence, the reviewing court "[could not] conclude that they amounted to misconduct [since] the record [did] not demonstrate how they might have influenced the jury or otherwise affected the trial"]; *People v. Silveria and Travis, supra*, 10 Cal.5th at p. 320 [judicial remarks "could not have prejudiced either jury's view of [defendant or his counsel]" as they were made

34

outside the jury's presence].)  We thus conclude on this record defendant has failed to establish judicial misconduct, much less prejudicial misconduct.

**V.**   ***The trial court did not violate defendant's jury trial rights under the Sixth Amendment.***

Defendant contends the trial court violated his Sixth Amendment right to a jury trial by imposing full, consecutive terms on the nine determinate counts upon finding for purposes of section 667.6, subdivision (d) that the crimes involved the same victim on separate occasions.  We begin with the relevant legal framework.

Sentencing on multiple crimes is generally governed by section 1170.1, which allows either a concurrent sentence or a consecutive sentence with a principal term and consecutive subordinate terms of one-third the middle term.  Section 667.6, subdivision (d), however, carves out an exception for certain enumerated sex offenses, including (as relevant here) forcible rape in violation of section 261, subdivision (a)(2) (counts 6–7, 15); forcible lewd act in violation of section 288, subdivision (b) (counts 1, 3, 14); and forcible oral copulation in violation of section 287, subdivision (c)(2) (counts 10–11, 16). (§ 667.6, subds. (d), (e)(1), (5), (7).)  Where a defendant is convicted of more than one of these offenses, full-term, consecutive sentences are required "if the crimes involve separate victims or involve the same victim on separate occasions."  (§ 667.6, subd. (d)(1).)  Moreover, in determining whether a crime against a single victim was committed on a separate occasion, the court (not the jury) "shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred

35

on separate occasions." (§ 667.6, subd. (d)(2); accord, Cal. Rules of Court, rule 4.426(a).)

In this case, the trial court made the factual finding that each of the charged offenses reflected separate incidents for purposes of the sentencing scheme. The trial court then imposed full, consecutive terms on determinate counts 1, 3, 6–7, 10–11, and 14–16, resulting in a total determinate term of 69 years 4 months.[9]

On appeal, defendant argues that in the absence of a jury finding that he committed the identified offenses on separate occasions, the trial court lacked authority to impose consecutive sentences under section 667.6, subdivision (d). He relies on *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] and *Alleyne v. United States* (2013) 570 U.S. 99 [186 L.Ed.2d 314]. *Apprendi* held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt . . . : 'It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " (*Apprendi, supra*, at p. 490.) *Alleyne* thereafter extended *Apprendi*'s holding to include judicial fact finding that increases the mandatory minimum sentence for a crime. (*Alleyne, supra*, at p. 103.)

After briefing in this appeal concluded, the California Supreme Court rejected this very argument in *People v. Catarino* (2023) 14 Cal.5th 748. There, the court held "the rule of *Apprendi* and *Alleyne* does not apply to section 667.6(d) under the rationale of [*Oregon v.*] *Ice* [(2009) 555 U.S. 160]

---

[9] Count 15 charged forcible rape (§ 261, subd. (a)(2)). However, as discussed *ante*, defendant's conviction on count 15 must be reversed for insubstantial evidence. Defendant is entitled to resentencing based on this error.

36

[172 L.Ed.2d 517].” (*People v. Catarino, supra*, at p. 750.) In *Ice*, the United States Supreme Court held the *Apprendi* rule does not apply to facts deemed necessary to the imposition of consecutive as opposed to concurrent sentences, because this decision is “a sentencing function in which the jury traditionally played no part . . . .” (*Oregon v. Ice*, at p. 163.) Thus, applying *Ice*, *People v. Catarino* upheld a sentence that included full, consecutive terms on seven separate acts of sexual abuse, reasoning that “ ‘ “the Sixth Amendment’s restriction on judge-found facts” is “inapplicable” when a trial judge makes factual findings necessary to the imposition of consecutive terms’ ” under section 667.6, subdivision (d). (*People v. Catarino, supra*, at pp. 751, 755, 757.)

In light of this binding high court decision, defendant’s Sixth Amendment challenge to the trial court’s imposition of a 144 years to life sentence pursuant to section 667.6, subdivision (d) fails. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.) “Because section 667.6(d) falls within the rationale of *Ice*, its operation does not violate the rule of *Apprendi* and *Alleyne*.” (*People v. Catarino, supra*, 14 Cal.5th at p. 757.)

## VI.  *Defendant’s sentence does not violate the Eighth Amendment’s ban on cruel and unusual punishment.*

Defendant also contends his total sentence of 144 years to life constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution.[10]  A punishment is cruel and unusual in violation of the federal Constitution if it is grossly disproportionate to the severity of the crime. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993; see

---

[10] The Eighth Amendment of the United States Constitution applies to individual states, including California. (*People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.)

*Rummel v. Estelle* (1980) 445 U.S. 263, 271 [63 L.Ed.2d 382].) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing v. California* (2003) 538 U.S. 11, 24 [155 L.Ed.2d 108].) Applying this principle, " '[a] court must begin by comparing the gravity of the offense and severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. [Citation.]' [Citation.]" (*In re Coley* (2012) 55 Cal.4th 524, 542.)

On appeal, we independently consider the legal question of whether a punishment is cruel and unusual, while resolving any relevant factual issues in the light most favorable to the judgment. (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190.) We also " ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' ([*Harmelin v. Michigan* (1991) 501 U.S. 957,] 999 [115 L.Ed.2d 836] (conc. opn. of Kennedy, J.), quoting *Solem v. Helm* (1983) 463 U.S. 277, 290 [77 L.Ed.2d 637, 103 S.Ct. 3001].) This is especially so in assessing the proportionality of a sentence of imprisonment, where 'the relative lack of objective standards concerning terms of imprisonment' means that successful challenges are ' " 'exceedingly rare.' " ' (*Harmelin*, at p. 1001 (conc. opn. of Kennedy, J.), quoting *Solem v. Helm, supra*, at p. 290.) Even ' "extended analysis" ' of a sentence's proportionality

is rarely required.  (*Harmelin*, at p. 1004 (conc. opn. of Kennedy, J.).) '[C]omparative analysis within and between jurisdictions is . . . [¶] . . . appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'  (*Id*. at pp. 1004–1005 (conc. opn. of Kennedy, J.).)" (*People v. Edwards, supra*, at pp. 190–191.)

Attempting to meet this standard, defendant argues that a sentence, such as his, that "no human could conceivably complete" in his or her lifetime does not serve any of the legitimate goals of our criminal justice system such as rehabilitation, retribution, public safety, or deterrence, and therefore "serves no rational legislative purpose under any legitimate theory of punishment."  While acknowledging a sentence of life without possibility of parole (LWOP) may not be per se unconstitutional, he also points out that none of his offenses carries a statutorily prescribed LWOP term; nor is there a statute prescribing an LWOP term for some threshold number of enumerated sex offenses.

The People, in turn, respond that many courts have upheld in the face of Eighth Amendment challenges comparable sentences exceeding 100 years on multiple sex abuse counts.  (See, e.g., *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 (*Bestelmeyer*) ["Consecutive prison terms totaling 129 years imposed as punishment for the commission of 25 separate serious offenses is not cruel or unusual punishment"]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1230–1231 [upholding 135 years to life on 16 counts of sexually abusing four young girls, some by force or threat]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 536–537 [upholding 210 years to life sentence for six robbery counts].)

We agree with the People that, in light of our limited role in reviewing a challenge of this nature (*People v. Edwards, supra*, 34 Cal.App.5th at pp. 190–191), there is no basis upon which to conclude defendant's cumulative sentence of 144 years to life shocks the conscience or is grossly disproportionate to the severity of his crimes. For one, his crimes were no doubt egregious. California courts have long recognized " 'a strong public policy to protect children of tender years.' [Citation.]" (*People v. Wilson* (2020) 56 Cal.App.5th 128, 169.) Indeed, even "lewd conduct on a child[, which] may not be the most grave of all offenses, . . . may have lifelong consequences to the well-being of the child." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806; *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 [152 L.Ed.2d 403] ["sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"].)

Defendant's crimes were also numerous. Based on their severity and numerosity, the trial court followed the statutory guidelines, including section 676.6, subdivision (d), discussed at length *ante*, to impose consecutive middle terms on the determinate counts. The court also used its authority under California Rules of Court, rule 4.425, to impose additional consecutive middle terms on the indeterminate counts based on aggravating circumstances that included defendant's misuse of his position of trust in committing the crimes and the nature of the victim's injuries. Defendant does not dispute the trial court acted in accordance with these guidelines.

It is well established that the Legislature, not the courts, defines and sets the punishment for a particular crime. Under the doctrine of separation of powers, "a court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Wingo* (1975) 14 Cal.3d 169, 174; see *People v. Baker* (2018) 20 Cal.App.5th 711, 724.) Here, "the Legislature

40

was well within its constitutional prerogatives when it mandated full-term consecutive sentences for the type of sex crimes we see in this case." (*Bestelmeyer, supra*, 166 Cal.App.3d at pp. 531–532; accord, *People v. Edwards, supra*, 34 Cal.App.5th at pp. 190–191.) Given these circumstances, defendant's sentence must stand, as there is no recognized legal basis for this court to disturb it.

## VII. *No Cumulative Error.*

Lastly, defendant contends the cumulative effect of the claimed errors was prejudicial, warranting reversal. Under the cumulative error doctrine, we reverse a judgment if there is a reasonable probability the jury would have reached a result more favorable to defendant absent a combination of errors. (E.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

Here, this standard is not met. While defendant's trial may have been less than perfect, he was deprived of neither due process nor a fair trial. Reversal is therefore unwarranted. (See *People v. Henriquez* (2017) 4 Cal.5th 1, 48 [" 'Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal' "].)

## VIII. *The abstract of judgment must be modified.*

The parties correctly recognize that a clerical error was made on the abstract of judgment regarding defendant's sentence on count 2. Specifically, on the record, the trial court imposed a concurrent 25 years to life term on count 2. However, the abstract of judgment is silent as to whether the count 2 sentence is consecutive or concurrent. Accordingly, we order this error to be corrected on remand.

## DISPOSITION

The trial court is directed to: (1) vacate the six-year consecutive sentence on count 15, (2) modify the abstract of judgment with respect to the sentence on count 2 to reflect that it was imposed to run concurrently rather than consecutively, and (3) forward a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation.  In all other regards, the judgment is affirmed.


                                                  Jackson, P. J.


WE CONCUR:


Simons, J.
Burns, J.

A164901/*People v. Vinctonivish Dwane Lee*